UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION
_____

BRASHARD DELANEY,

                    Plaintiff,                        Case No. 2:23-cv-179

v.                                                    Honorable Maarten Vermaat

JEFF HOWARD et al.,

                    Defendants.
_____/

## <u>OPINION</u>

This is a civil rights action brought by a state prisoner under 42 U.S.C. § 1983. Pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure, Plaintiff consented to proceed in all matters in this action under the jurisdiction of a United States magistrate judge. (ECF No. 1, PageID.17.)

This case is presently before the Court for preliminary review under the Prison Litigation Reform Act, Pub. L. No. 104-134, 110 Stat. 1321 (1996) (PLRA), pursuant to 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c). The Court is required to conduct this initial review prior to the service of the complaint. *See In re Prison Litig. Reform Act*, 105 F.3d 1131, 1131, 1134 (6th Cir. 1997); *McGore v. Wrigglesworth*, 114 F.3d 601, 604–05 (6th Cir. 1997). Service of the complaint on the named defendants is of particular significance in defining a putative defendant's relationship to the proceedings.

"An individual or entity named as a defendant is not obliged to engage in litigation unless notified of the action, and brought under a court's authority, by formal process." *Murphy Bros. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 347 (1999). "Service of process, under longstanding

tradition in our system of justice, is fundamental to any procedural imposition on a named defendant." *Id.* at 350. "[O]ne becomes a party officially, and is required to take action in that capacity, only upon service of a summons or other authority-asserting measure stating the time within which the party served must appear and defend." *Id.* (citations omitted). That is, "[u]nless a named defendant agrees to waive service, the summons continues to function as the *sine qua non* directing an individual or entity to participate in a civil action or forgo procedural or substantive rights." *Id.* at 351. Therefore, the PLRA, by requiring courts to review and even resolve a plaintiff's claims before service, creates a circumstance where there may only be one party to the proceeding—the plaintiff—at the district court level and on appeal. *See, e.g., Conway v. Fayette Cnty. Gov't*, 212 F. App'x 418 (6th Cir. 2007) ("Pursuant to 28 U.S.C. § 1915A, the district court screened the complaint and dismissed it without prejudice before service was made upon any of the defendants . . . [such that] . . . only [the plaintiff] [wa]s a party to this appeal.").

Here, Plaintiff has consented to a United States magistrate judge conducting all proceedings in this case under 28 U.S.C. § 636(c). That statute provides that "[u]pon the consent of the parties, a full-time United States magistrate judge . . . may conduct any or all proceedings . . . and order the entry of judgment in the case . . . ." 28 U.S.C. § 636(c). Because the named Defendants have not yet been served, the undersigned concludes that they are not presently parties whose consent is required to permit the undersigned to conduct a preliminary review under the PLRA, in the same way they are not parties who will be served with or given notice of this opinion. *See Neals v. Norwood*, 59 F.3d 530, 532 (5th Cir. 1995) ("The record does not contain a consent

from the defendants. However, because they had not been served, they were not parties to this action at the time the magistrate entered judgment.").[1]

Under the PLRA, the Court is required to dismiss any prisoner action brought under federal law if the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant immune from such relief. 28 U.S.C. §§ 1915(e)(2), 1915A; 42 U.S.C. § 1997e(c). The Court must read Plaintiff's *pro se* complaint indulgently, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972), and accept Plaintiff's allegations as true, unless they are clearly irrational or wholly incredible. *Denton v. Hernandez*, 504 U.S. 25, 33 (1992). Applying these standards, the Court will dismiss Plaintiff's complaint for failure to state a claim.

## Discussion

### I.     Factual allegations

Plaintiff is presently incarcerated with the Michigan Department of Corrections (MDOC) at the Baraga Correctional Facility (AMF) in Baraga, Baraga County, Michigan. The events about which he complains occurred at that facility. Plaintiff sues Warden Jeff Howard, Deputy Warden Unknown Hoffman, Assistant Deputy Warden Unknown Dunn, Inspector Unknown Miller, Inspector Unknown Menerick, Doctor Patricia Lewis, Nurse Unknown Lisa, and Corrections

---

[1] *But see Coleman v. Lab. & Indus. Rev. Comm'n of Wis.*, 860 F.3d 461, 471 (7th Cir. 2017) (concluding that, when determining which parties are required to consent to proceed before a United States magistrate judge under 28 U.S.C. § 636(c), "context matters" and the context the United States Supreme Court considered in *Murphy Bros.* was nothing like the context of a screening dismissal pursuant to 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c)); *Williams v. King*, 875 F.3d 500, 503–04 (9th Cir. 2017) (relying on Black's Law Dictionary for the definition of "parties" and not addressing *Murphy Bros.*); *Burton v. Schamp*, 25 F.4th 198, 207 n.26 (3d Cir. Feb. 10, 2022) (premising its discussion of "the term 'parties' solely in relation to its meaning in Section 636(c)(1), and . . . not tak[ing] an opinion on the meaning of 'parties' in other contexts").

Officers Unknown Pangrassi, Unknown Sanchez, Unknown Homer, Unknown Caperalli, and Unknown Smith in their personal capacities.

Plaintiff alleges that on November 30, 2022, he had a doctor's appointment with Defendant Lewis. During this appointment, Plaintiff was diagnosed with Type 2 Diabetes Mellitus. Plaintiff was given glucose monitoring equipment, including lancets and an Accucheck. Defendant Lewis prescribed insulin twice a day and Plaintiff was moved to Unit 5, which is a diabetic unit. (ECF No. 1, PageID.6.)

On March 11, 2023, at approximately 7:10 a.m., Plaintiff entered the insulin room where non-defendant Nurse Orr and Defendant Caperalli were waiting. Plaintiff states that Orr, who was normally friendly, dropped her head and did not speak to Plaintiff or make eye contact. Plaintiff was confused and looked at Defendant Caperalli, who was scowling. Plaintiff administered his insulin. Plaintiff states that he was very disturbed by the incident and although he went to the insulin line, he refused his insulin from that evening until the morning of March 13, 2023. On March 13, 2023, Plaintiff had a phone appointment with Defendant Lewis, who asked why he had been refusing his insulin. Plaintiff told Defendant Lewis about the incident and stated that he wanted to manage his condition without insulin. Defendant Lewis proposed changing Plaintiff's insulin "four in the morning, four at evening," and Plaintiff agreed. (*Id.*)

On March 20, 2023, Plaintiff had an appointment with Defendant Lewis, who asked Plaintiff about their prior phone conversation. Plaintiff states that because Defendant Homer, who was very influential among the Corrections Officers, was present he avoided the topic for fear of retribution. As he was being unchained by Defendant Homer, Plaintiff asked if he would refer him to get dropped down to an STG 1 designation. Defendant Homer responded by stating, "[You're] in the middle of everything and [you're] a Foe Corner Hustler, pretending to be a Latin Count."

(*Id.* at PageID.7.)[2] Plaintiff states that in late summer of 2022, corrections officers at AMF had been assaulted and the administration had blamed Marcus Hill, the leader of the Foe Corna Hustla's. (*Id.*)

On March 25, 2023, the insulin line was run for all diabetics and breakfast was passed out. Plaintiff states that when he was released from his cell for insulin, Nurse Orr was waiting with Sergeant Cordono and an older corrections officer with gray hair and a beard. Plaintiff states that this was the first time that two corrections officers were present during his insulin callout. Plaintiff later asked other diabetics if this had happened to them, and they said that it had not. (*Id.*)

On March 27, 2023, three corrections officers were present during Plaintiff's insulin callout and had openly hostile expressions, which caused Plaintiff to become so anxious that he began shaking. While on the yard that same morning, Plaintiff noted eight to nine corrections officers wearing black gloves assembled on the back porch of Unit 5, watching the yard while cracking their knuckles and looking ready for a fight. (*Id.*)

On April 10, 2023, between 6:00 and 7:15 p.m., he was talking on the phone with his brother about posting something on Facebook. On April 11, 2023, Plaintiff refused his insulin and when Plaintiff came out for J-Pay, Defendant Smith asked why Plaintiff had not come out for his insulin and stated that Plaintiff's "girl" was there. (*Id.*) Later that evening, Defendant Miller told Plaintiff that he was on his "hit list." (*Id.*)

---

[2] The references to being a "Hustler" appear to be references to the street gang "the Four Corner Hustlers." *See, e.g., United States v. Ford*, 761 F.3d 641, 648 n.5 (6th Cir. 2014) (a criminal prosecution for various federal crimes where the defendants challenged the admission of evidence regarding their gang affiliation with "the Four Corner Hustlers, a branch of the Vice-Lords"); *United States v. Turnipseed*, 47 F.4th 608 (7th Cir. 2022) (a criminal prosecution related to the defendant's participation in the "Four Corner Hustlers street gang");

On April 19, 2023, Plaintiff asked his brother to relay an ambiguous message to an associate named "Quay." (*Id.* at PageID.7-8.) The next day, Plaintiff's cell door was opened at the same time as that of another prisoner who Plaintiff recognized. Plaintiff states that staff were aware that he and the other prisoner were enemies. Non-defendant Corrections Officer Cleary was standing outside the bubble in a stance that looked like he was prepared to break up a fight. (*Id.* at PageID.8.)

Plaintiff states that an associate of his was taken to segregation for smuggling coffee on April 21, 2023, and the next day, the sergeant, lieutenant and members of the administration told Plaintiff that he was going to the hole next. (*Id.*) When Plaintiff went to the insulin line on April 21, 2023, Defendant Caperalli was seated about five feet away drinking coffee. Suddenly a tall corrections officer entered the area stating that he wanted to make sure it was extra safe in the area. Plaintiff asked other diabetics if this had happened to them and was told that it had not. (*Id.*) On April 22, 2023, Plaintiff refused his morning insulin because he felt that staff were creating intimidating conditions. (*Id.*)

On April 23, 2023, Plaintiff went to get his insulin at 5:15 p.m. and noticed non-defendants Corrections Officer Ochampaugh and an unknown lieutenant standing in the hallway observing Plaintiff. On April 24, 2023, Plaintiff covered his window with a towel while he used the bathroom and Defendant Sanchez instructed Plaintiff to take down the towel. Defendant Sanchez then announced that anybody who had anything covering their windows would receive a class III misconduct. A few minutes later, nurse Lisa walked by Plaintiff's cell with her head down. (*Id.*) Shortly thereafter, Plaintiff logged into his J-Pay account and found a notification that an email from his brother, Cornell Jett, had been rejected due to content. (*Id.* at PageID.8–9.)

The next day Plaintiff attempted to login to his store account, but his password was rejected. As Plaintiff was exiting the J-Pay room, Defendant Caperalli entered the unit, saying that he came to get a duffle bag. Plaintiff later learned that this is code for telling a prisoner to attack, so that can be transferred out of the prison. Plaintiff returned to his cell and his door was left open for a significant amount of time. Plaintiff finally asked for the door to be shut. Plaintiff also asserts that around the same time, his J-Pay tablet became infected with a virus that resulted in the deletion of his music and pictures, and that he was unable to access his messages. (*Id.* at PageID.9.)

Plaintiff states that he was forced to refuse his morning insulin on April 25, 2023, and April 26, 2023, because "staff was continuing to create hostile, intimidating conditions to deter and interfere with [Plaintiff's'] insulin treatment." (*Id.*) On April 26, 2023, Plaintiff received a note from Defendant Lewis stating that his A1C was elevated from his level in March and that this was a direct result of his frequent insulin refusals. (*Id.*)

Plaintiff alleges that on April 27, 2023, he noticed that Defendant Homer "flared up" in a hostile manner whenever Plaintiff passed him in the yard. (*Id.*) Plaintiff refused his morning insulin for the next three days because of the "hostile, intimidating conditions." (*Id.*) On May 1, 2023, Plaintiff came out for his morning insulin and on the way turned in a grievance stating that he was being subjected to ongoing harassment and intimidation by staff while in the insulin line. (*Id.*) Non-defendant Corrections Officer Christof was the only corrections officer in the insulin room and about thirty minutes later, Corrections Officer Christof ordered everyone in the unit to remove paper from their window. (*Id.* at PageID.9–10.) Plaintiff's neighbor received a ticket from Christof a few minutes later and shortly thereafter all lights, ventilation, and power went out. Non-defendant Prison Counselor Wilson announced that power should be restored by second shift. (*Id.* at PageID.10.)

On May 1, 2023, Plaintiff submitted a grievance stating that the ongoing "harassment" was making him paranoid. (*Id.*) On May 3, 2023, Plaintiff spoke to Defendant Lewis who arranged for Plaintiff to receive insulin only once per day in the evening. On May 5, 2023, Plaintiff came out of his cell on first shift for J-Pay. Plaintiff also submitted a kite to Defendant Miller stating that he did not have a problem with staff but just wanted to go home. Plaintiff hoped that would create goodwill between himself and the administration. (*Id.*)

On May 9, 2023, Plaintiff was let out to receive his insulin and Defendant Homer, who had a "defiant expression on his face," and two other corrections officers were present in the insulin room. (*Id.*) On May 16, 2023, Defendant Lewis told Plaintiff that she would recommend Duloxitine for diabetic pain in his feet, but it would have to be approved. (*Id.*) On May 18, 2023, Plaintiff spoke to his brother and asked him have Plaintiff's son's mother send him a newsletter because she was "holding up" Plaintiff's business. (*Id.*)

On May 20, 2023, at approximately 7:00 a.m., emergency count was "blown" and Plaintiff saw non-defendant Corrections Officer Peele looking out of health care and then crawling on his hands and knees to look inside third row windows. Later that day, Defendant Pangrassi saw Plaintiff looking out his window and made a talking gesture with his hands. Defendant Pangrassi then looked at the third row of windows, turned back to Plaintiff, and covered his mouth with his hands. (*Id.* at PageID.10–11.)

On May 22, 2023, health officials brought Plaintiff his Duloxitine, which was a "keep on person" medication. (*Id.* at PageID.11.) Plaintiff placed a letter to Lansing in outgoing mail, which gave a detailed account of the harassment and intimidation. (*Id.*) On May 23, 2023, Plaintiff filed a grievance on Defendants Pangrassi, Howard, and Lewis, detailing the events of May 20, 2023. At about 11:00 a.m., Plaintiff witnessed Defendants Homer and Lewis talking in front of health

care, but when they noticed Plaintiff watching, they abruptly went into health care. The same morning, an associate of Plaintiff's was taken to segregation temporarily for refusing health care. Defendant Homer then shouted, "who's next?" (*Id.*) At approximately 5:00 p.m. that day, non-defendant Corrections Officers Londo and Ochampaugh were discussing segregation and stated, "I heard sometimes they forget to run insulin in unit-3." (*Id.*)

On May 24, 2023, Plaintiff submitted a letter to Lansing for mailing, which complained about the problems Plaintiff was having in the insulin line. On May 31, 2023, when Plaintiff came out of his cell to shower, non-defendant Londo and Defendant Smith both rose from their seats and took up a fighting stance. Later that day, Defendant Homer stared at Plaintiff while he was injecting his medication. On June 2, 2023, Defendant Smith opened Plaintiff's door for insulin, so Plaintiff told him that he did not receive morning insulin anymore. (*Id.*) On June 3 and 4 of 2023, Defendant Smith again opened Plaintiff's door for morning insulin. (*Id.* at PageID.11–12.)

On June 5, 2023, Plaintiff filed a grievance on Defendant Smith for continuing to open his door in the morning, which exposed him to other corrections officers, including Defendants Sanchez and Caperalli. Plaintiff complained that Defendant Smith was retaliating against him for filing grievances and contacting the Director's Office. (*Id.* at PageID.12.)

Plaintiff complained to Defendant Howard about the harassment he was experiencing during insulin lines and that his phone calls were being intentionally dropped and that the phone would not work at all on some days. Defendant Howard told Plaintiff to file a kite and he would look into it. (*Id.*) Plaintiff filed a step II grievance on Defendant Smith on June 11, 2023. On June 12, 2023, Defendants Caperalli, Pangrassi, and Homer worked in the yard and when Plaintiff came in from yard, Defendant Homer was standing by the stairs, which was unusual for staff. At approximately 5:00 p.m., Plaintiff's door was opened for insulin line and Defendant Homer was

seated by the bubble. Plaintiff refused his insulin in order to avoid Defendant Homer because he believed Defendant Homer intended to provoke him. (*Id.*)

On June 13, 2023, Plaintiff filed a step II grievance regarding the events of May 20, 2023, and named Defendant Homer as one of the corrections officers who had been harassing him. Plaintiff later noticed Defendant Homer looking like he wanted to fight Plaintiff and when he returned from yard his cell had been tossed. Defendant Homer later walked past Plaintiff and whispered, "Aye sugar baby, this is harassment, I don't care if you never take your sugar, save the state some money." (*Id.*) Defendant Homer was again seated by the bubble when Plaintiff came out for his insulin that evening. (*Id.* at PageID.12–13.) On June 14, 2023, Defendant Homer was in the insulin room and on June 15, 2023, "they" attempted to plant another virus on Plaintiff's tablet, but he disconnected the tablet before the virus could activate. (*Id.* at PageID.13.) On June 16, 2023, Defendant Homer told Plaintiff that they would get back at him for everything eventually. Plaintiff then saw one of the female corrections officers who had been assaulted by members of "almighty people nation" standing on the back porch. Plaintiff indicates that he is part of the "almighty people nation." (*Id.*) Defendant Homer was in the insulin room again that evening and mouthed "she's next" to Plaintiff while the nurse was preparing his insulin. (*Id.*) Defendant Homer then asked Plaintiff what was up with his neighbor who had so much to say but had now gone quiet. Plaintiff states that this occurred the same day he turned in his step II grievance appeal regarding the events of May 20, 2023, which implicated Defendant Homer. (*Id.*)

On June 20, 2023, Plaintiff submitted a grievance on Defendant Homer for telling him that they would get back at him eventually. Later that day, Defendant Homer nodded toward Nurse Skinnerup and winked at Plaintiff, mouthing "she's next." (*Id.*) Plaintiff details alleged harassment

by non-defendant staff that occurred between June 20, 2023, and July 17, 2023. (*Id.* at PageID.13–14.)

On July 18, 2023, Plaintiff had his neighbor turn in a step II grievance form. On August 12, 13, and 14 of 2023, Plaintiff attempted to use the phone but his calls were blocked. On August 15, 2023, Plaintiff filed a step II grievance on non-defendant Christolf. On August 22, 2023, Plaintiff received correspondence from the grievance coordinator stating that he had failed to attach the white copy to his step I and II grievance form, so it was being returned. Plaintiff resubmitted the step I and II grievance forms that day. (*Id.* at PageID.15.)

On August 27, 2023, when Plaintiff went out for his evening insulin, he was harassed by non-defendants Cleary and Beasley, who attempted to provoke him. Plaintiff states that the absence of a safe environment to receive medical treatment has caused him to suffer from prolonged spells of severe depression, and he is unable to leave his cell for any activity without wondering if something bad is going to happen.

Plaintiff states that Defendants violated his rights under the First, Eighth, and Fourteenth Amendments. Plaintiff seeks compensatory and punitive damages, as well as declaratory and injunctive relief.

## II.  Failure to state a claim

A complaint may be dismissed for failure to state a claim if it fails "to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions. *Id.*; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The court must determine whether the complaint contains "enough facts to state a claim to relief that

is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 679. Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief." *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)); *see also Hill v. Lappin*, 630 F.3d 468, 470–71 (6th Cir. 2010) (holding that the *Twombly/Iqbal* plausibility standard applies to dismissals of prisoner cases on initial review under 28 U.S.C. §§ 1915A(b)(1) and 1915(e)(2)(B)(ii)).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996). Because § 1983 is a method for vindicating federal rights, not a source of substantive rights itself, the first step in an action under § 1983 is to identify the specific constitutional right allegedly infringed. *Albright v. Oliver*, 510 U.S. 266, 271 (1994).

### A.      Failure to Allege Unconstitutional Action

Plaintiff fails to make any allegations against Defendants Dunn, Hoffman, and Menerick in the body of his complaint. Regarding Defendant Lisa, Plaintiff's sole allegation is that she walked by his cell on one occasion with her head down. It is a basic pleading essential that a plaintiff attribute factual allegations to particular defendants. *See Twombly*, 550 U.S. at 545 (holding that, in order to state a claim, a plaintiff must make sufficient allegations to give a defendant fair notice of the claim). The Sixth Circuit "has consistently held that damage claims

against government officials arising from alleged violations of constitutional rights must allege, with particularity, facts that demonstrate what *each* defendant did to violate the asserted constitutional right." *Lanman v. Hinson*, 529 F.3d 673, 684 (6th Cir. 2008) (emphasis in original) (citing *Terrance v. Northville Reg'l Psych. Hosp.*, 286 F.3d 834, 842 (6th Cir. 2002)). Where a person is named as a defendant without an allegation of specific conduct, the complaint is subject to dismissal, even under the liberal construction afforded to *pro se* complaints. *See Frazier v. Michigan*, 41 F. App'x 762, 764 (6th Cir. 2002) (dismissing the plaintiff's claims where the complaint did not allege with any degree of specificity which of the named defendants were personally involved in or responsible for each alleged violation of rights); *Griffin v. Montgomery*, No. 00-3402, 2000 WL 1800569, at *2 (6th Cir. Nov. 30, 2000) (requiring allegations of personal involvement against each defendant) (citing *Salehpour v. Univ. of Tenn.*, 159 F.3d 199, 206 (6th Cir. 1998)); *Rodriguez v. Jabe*, No. 90-1010, 1990 WL 82722, at *1 (6th Cir. June 19, 1990) ("Plaintiff's claims against those individuals are without a basis in law as the complaint is totally devoid of allegations as to them which would suggest their involvement in the events leading to his injuries."). Plaintiff fails to even mention Defendants Dunn, Hoffman, and Menerick in the body of his complaint, and as noted previously, he merely alleges that Defendant Lisa walked past his cell with her head down on one occasion. His allegations fall far short of the minimal pleading standards under Fed. R. Civ. P. 8 (requiring "a short and plain statement of the claim showing that the pleader is entitled to relief").

### B.      Supervisory Liability

Plaintiff fails to allege that Defendant Howard took any action against him, other than to suggest that Defendant Howard failed to adequately supervise subordinates or respond to Plaintiff's grievances and kites. Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior or vicarious

liability. *Iqbal*, 556 U.S. at 676; *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 691(1978); *Everson v. Leis*, 556 F.3d 484, 495 (6th Cir. 2009). A claimed constitutional violation must be based upon active unconstitutional behavior. *Grinter v. Knight*, 532 F.3d 567, 575–76 (6th Cir. 2008); *Greene v. Barber*, 310 F.3d 889, 899 (6th Cir. 2002). The acts of one's subordinates are not enough, nor can supervisory liability be based upon the mere failure to act. *Grinter*, 532 F.3d at 576; *Greene*, 310 F.3d at 899; *Summers v. Leis*, 368 F.3d 881, 888 (6th Cir. 2004). Moreover, § 1983 liability may not be imposed simply because a supervisor denied an administrative grievance or failed to act based upon information contained in a grievance. *See Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999). "[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676.

The Sixth Circuit repeatedly has summarized the minimum required to constitute active conduct by a supervisory official:

> "[A] supervisory official's failure to supervise, control or train the offending individual is not actionable *unless* the supervisor either encouraged the specific incident of misconduct or in some other way directly participated in it." *Shehee,* 199 F.3d at 300 (emphasis added) (internal quotation marks omitted). We have interpreted this standard to mean that "at a minimum," the plaintiff must show that the defendant "at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers."

*Peatross v. City of Memphis*, 818 F.3d 233, 242 (6th Cir. 2016) (quoting *Shehee*, 199 F.3d at 300, and citing *Phillips v. Roane Cnty.*, 534 F.3d 531, 543 (6th Cir. 2008)); *see also Copeland v. Machulis*, 57 F.3d 476, 481 (6th Cir. 1995) (citing *Rizzo v. Goode*, 423 U.S. 362, 375–76 (1976), and *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984)); *Walton v. City of Southfield*, 995 F.2d 1331, 1340 (6th Cir. 1993); *Leach v. Shelby Cnty. Sheriff*, 891 F.2d 1241, 1246 (6th Cir. 1989).

Plaintiff fails to allege any facts showing that Defendant Howard encouraged or condoned the conduct of his subordinates, or authorized, approved or knowingly acquiesced in the conduct.

14

His vague and conclusory allegations of supervisory responsibility are insufficient to demonstrate that Defendant Howard was personally involved in the events complained of by Plaintiff in this case. Conclusory allegations of unconstitutional conduct without specific factual allegations fail to state a claim under § 1983. *See Iqbal*, 556 U.S. at 678–79; *Twombly*, 550 U.S. at 555. Because Plaintiff's claim against Defendant Howard is premised on nothing more than respondeat superior liability, it fails to state a claim.

### C. Constitutional Claims Against the Remaining Defendants[3]

#### 1. Eighth Amendment claims

##### a. Defendant Lewis

Plaintiff's only allegations regarding Defendant Lewis relate to his treatment of Plaintiff's medical condition. The Eighth Amendment prohibits the infliction of cruel and unusual punishment against those convicted of crimes. U.S. Const. amend. VIII. The Eighth Amendment obligates prison authorities to provide medical care to incarcerated individuals, as a failure to provide such care would be inconsistent with contemporary standards of decency. *Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976). The Eighth Amendment is violated when a prison official is deliberately indifferent to the serious medical needs of a prisoner. *Id.* at 104–05; *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001).

Deliberate indifference may be manifested by a doctor's failure to respond to the medical needs of a prisoner, or by "prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed. Regardless of how evidenced,

---

[3] The Court notes that Plaintiff's complaint contains allegations concerning individuals who have not been named as defendants in this action. Because these allegations do not concern parties to this action, the Court will not address those allegations. Should Plaintiff wish to pursue claims against these individuals, he is free to bring a lawsuit against them.

deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983." *Estelle*, 429 U.S. at 104–05.

Plaintiff alleges that Defendant Lewis prescribed insulin as treatment for his Type II Diabetes, and later modified the prescription to accommodate Plaintiff's issues with staff. Defendant Lewis monitored Plaintiff's A1C, questioned him about his repeated refusals to take his insulin, and again modified the insulin prescription. Finally, Defendant Lewis prescribed Duloxitine as treatment for diabetic pain in Plaintiff's feet. Nowhere in his complaint does Plaintiff allege facts showing that Defendant Lewis failed to address Plaintiff's medical needs on even a single occasion. Therefore, the Court concludes that Plaintiff's Eighth Amendment claim against Defendant Lewis is properly dismissed.

### b.    Defendant Sanchez

Plaintiff's allegations against Defendant Sanchez fail to implicate the Eighth Amendment. The Eighth Amendment imposes a constitutional limitation on the power of the states to punish those convicted of crimes. Punishment may not be "barbarous," nor may it contravene society's "evolving standards of decency." *Rhodes v. Chapman*, 452 U.S. 337, 345–46 (1981). The Amendment, therefore, prohibits conduct by prison officials that involves the "unnecessary and wanton infliction of pain." *Ivey v. Wilson*, 832 F.2d 950, 954 (6th Cir. 1987) (per curiam) (quoting *Rhodes*, 452 U.S. at 346). The deprivation alleged must result in the denial of the "minimal civilized measure of life's necessities." *Rhodes*, 452 U.S. at 347; *see also Wilson v. Yaklich*, 148 F.3d 596, 600–01 (6th Cir. 1998). The Eighth Amendment is only concerned with "deprivations of essential food, medical care, or sanitation" or "other conditions intolerable for prison confinement." *Rhodes*, 452 U.S. at 348 (citation omitted). Moreover, "[n]ot every unpleasant experience a prisoner might endure while incarcerated constitutes cruel and unusual punishment within the meaning of the Eighth Amendment." *Ivey*, 832 F.2d at 954. "Routine discomfort is 'part

16

of the penalty that criminal offenders pay for their offenses against society.'" *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (quoting *Rhodes*, 452 U.S. at 347). As a consequence, "extreme deprivations are required to make out a conditions-of-confinement claim." *Id.*

Plaintiff's sole allegation against Defendant Sanchez is that he ordered him to remove a towel from his window on April 24, 2023, and announced that anyone covering their window would get a class III misconduct. Plaintiff fails to allege any facts showing that Defendant Sanchez engaged in conduct which subjected him to the type of extreme deprivation required to state a claim under the Eighth Amendment.

### c.    Defendants Miller, Pangrassi, Homer, Smith, and Caperalli

Plaintiff appears to be asserting that Defendants Miller, Pangrassi, Homer, Smith, and Caperalli violated his rights under the Eighth Amendment by subjecting him to harassment and that this caused him to refuse his insulin on multiple occasions. Plaintiff also states that the harassment caused him to suffer diabetic complications and depression.

Plaintiff alleges that Defendant Miller told him he was on a hit list on April 11, 2023, and that Defendant Pangrassi made gestures with his hands that represented talking and covering his mouth while looking at a row of windows on May 20, 2023. Defendant Homer referred to Plaintiff as a Foe Corn Hustler on March 20, 2023, mouthed "she's next" while gesturing toward nurses on June 16 and 20 of 2023, and called Plaintiff sugar baby and said he didn't care if Plaintiff ever took his sugar on June 13, 2023, after Plaintiff's cell had been tossed. Defendant Caperalli allegedly asked Plaintiff why he had not come out of his cell on April 11, 2023, stating that Plaintiff's girl was there. Plaintiff also alleges that Defendant Homer had a hostile expression on his face on some occasions and that Defendant Homer and Caperalli both used threatening body language when Plaintiff came out of his cell on a number of occasions. Plaintiff also states that the mere presence of Defendants Homer and Caperalli was enough to make Plaintiff feel threatened

when he came out of his cell for insulin. With respect to Defendant Caperalli, Plaintiff states that he scowled at Plaintiff during an insulin appointment on March 11, 2023, was seated nearby when Plaintiff went to get his insulin on April 21, 2023, and that on April 25, 2023, he entered the unit and announced that he had to get a duffel bag. Plaintiff also states that Defendant Caperalli was working in the yard on June 12, 2023, when Plaintiff had yard time.

The use of harassing or degrading language by a prison official, although unprofessional and deplorable, does not rise to constitutional dimensions. *See Ivey*, 832 F.2d 950, 954–55 (6th Cir. 1987); *see also Johnson v. Dellatifa*, 357 F.3d 539, 546 (6th Cir. 2004) (harassment and verbal abuse do not constitute the type of infliction of pain that the Eighth Amendment prohibits); *Violett v. Reynolds,* No. 02-6366, 2003 WL 22097827, at *3 (6th Cir. Sept. 5, 2003) (verbal abuse and harassment do not constitute punishment that would support an Eighth Amendment claim); *Thaddeus-X v. Langley*, No. 96-1282, 1997 WL 205604, at *1 (6th Cir. Apr. 24, 1997) (verbal harassment is insufficient to state a claim); *Murray v. U.S. Bureau of Prisons*, No. 95-5204, 1997 WL 34677, at *3 (6th Cir. Jan. 28, 1997) ("Although we do not condone the alleged statements, the Eighth Amendment does not afford us the power to correct every action, statement, or attitude of a prison official with which we might disagree."); *Clark v. Turner*, No. 96-3265, 1996 WL 721798, at *2 (6th Cir. Dec. 13, 1996) ("Verbal harassment or idle threats are generally not sufficient to constitute an invasion of an inmate's constitutional rights."); *Brown v. Toombs*, No. 92-1756, 1993 WL 11882 (6th Cir. Jan. 21, 1993) ("Brown's allegation that a corrections officer used derogatory language and insulting racial epithets is insufficient to support his claim under the Eighth Amendment.").

Allegations of verbal harassment or threats by prison officials toward an inmate do not constitute punishment within the meaning of the Eighth Amendment. *Ivey*, 832 F.2d at 955. Nor

18

do allegations of verbal harassment rise to the level of unnecessary and wanton infliction of pain proscribed by the Eighth Amendment. *Id.* Even the occasional or sporadic use of racial slurs, although unprofessional and reprehensible, does not rise to a level of constitutional magnitude. *See Torres v. Oakland Cnty.*, 758 F.2d 147, 152 (6th Cir. 1985). Thus, to the extent that Plaintiff is asserting that Defendants verbally harassed him, his complaint fails to state a claim.

To the extent that Plaintiff is asserting that he was deterred from receiving his insulin because of Defendants' facial expressions, stance, or mere presence near or in the insulin room, such allegations do not implicate the Eighth Amendment. Plaintiff does not allege that any Defendant ever directly warned him against receiving his insulin or prohibited him from doing so. The fact that Plaintiff ascribes an intent to convey some sort of threat to the largely nondescript behavior of each Defendant does not transform it into punishment that would support an Eighth Amendment claim. No facts alleged in Plaintiff's complaint support an inference that Plaintiff was prevented from receiving his insulin daily by anything other than his own subjective belief that Defendants' presence constituted a threat. Therefore, Plaintiff's Eighth Amendment claims against Defendants Miller, Pangrassi, Homer, Smith, and Caperalli are properly dismissed.

### 2.    Equal protection claims

Plaintiff claims that Defendants violated his Fourteenth Amendment right to equal protection by treating him differently than other diabetic prisoners because they put two or three corrections officers in the insulin room with Plaintiff while he was getting his insulin. The Equal Protection Clause of the Fourteenth Amendment provides that a state may not "deny to any person within its jurisdiction the equal protection of the laws," which is essentially a direction that all persons similarly situated should be treated alike. U.S. Const., amend. XIV; *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). A state practice generally will not require strict scrutiny unless it interferes with a fundamental right or discriminates against a suspect class of

individuals. *Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 312 (1976). Plaintiff does not allege that a fundamental right is implicated in this case or that he is a member of a suspect class; his claims therefore are not subjected to strict scrutiny.

To prove an equal protection claim in a class-of-one case, Plaintiff must demonstrate "intentional and arbitrary discrimination" by the state; that is, he must demonstrate that he "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000); *see also Nordlinger v. Hahn*, 505 U.S. 1, 10–11 (1992); *United States v. Green*, 654 F.3d 637, 651 (6th Cir. 2011). "'[T]he hallmark of [a "class-of-one"] claim is not the allegation that one individual was singled out, but rather, the allegation of arbitrary or malicious treatment not based on membership in a disfavored class.'" *Davis v. Prison Health Servs.*, 679 F.3d 433, 441 (6th Cir. 2012) (emphasis removed) (quoting *Aldridge v. City of Memphis*, 404 F. App'x 29, 42 (6th Cir. 2010)); *see also Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580, 592 (9th Cir. 2008) ("The 'class of one' theory . . . is unusual because the plaintiff in a 'class of one' case does not allege that the defendants discriminate against a *group* with whom she shares characteristics, but rather that the defendants simply harbor animus against her *in particular* and therefore treated her arbitrarily.") (emphasis in original). A plaintiff "must overcome a 'heavy burden' to prevail based on the class-of-one theory." *Loesel v. City of Frankenmuth*, 692 F.3d 452, 462 (6th Cir. 2012) (citing *TriHealth, Inc. v. Bd. of Comm'rs, Hamilton Cnty.*, 430 F.3d 783, 791 (6th Cir. 2005)). "Unless carefully circumscribed, the concept of a class-of-one equal protection claim could effectively provide a federal cause of action for review of almost every executive and administrative decision made by state actors." *Loesel*, 692 F.3d at 462 (quoting *Jennings v. City of Stillwater*, 383 F.3d 1199, 1210–11 (10th Cir. 2004)).

The threshold element of an equal protection claim is disparate treatment. *Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 260 (6th Cir. 2006). "To state an equal protection claim, a plaintiff must adequately plead that the government treated the plaintiff 'disparately as compared to similarly situated persons and that such disparate treatment either burdens a fundamental right, targets a suspect class, or has no rational basis.'" *Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011) (quoting *Club Italia Soccer & Sports Org., Inc.*, 470 F.3d at 298)). "'Similarly situated' is a term of art—a comparator . . . must be similar in 'all relevant respects.'" *Paterek v. Vill. of Armada*, 801 F.3d 630, 650 (6th Cir. 2015) (quoting *United States v. Green*, 654 F.3d 637, 651 (6th Cir. 2011)); *see also Nordlinger*, 505 U.S. at 10; *Tree of Life Christian Sch. v. City of Upper Arlington*, 905 F.3d 357, 368 (6th Cir. 2018) ("A plaintiff bringing an equal protection claim must be 'similarly situated' to a comparator in 'all relevant respects.'").

In this case, Plaintiff fails to allege facts showing that he was similarly situated to other prisoners who did not have two or three corrections officers in the room with them during their insulin appointments, such as their security classification, Security Threat Group (STG) status, history of violence towards corrections officers, or underlying convictions. The mere fact that the other prisoners were also diabetics is insufficient to show that they were similarly situated in all relevant respects to Plaintiff. Therefore, Plaintiff's equal protection claims are properly dismissed.

### 3. Retaliation claims

Finally, Plaintiff claims that Defendants retaliated against him in violation of the First Amendment. Retaliation based upon a prisoner's exercise of his or her constitutional rights violates the Constitution. *See Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc). In order to set forth a First Amendment retaliation claim, a plaintiff must establish three elements: (1) he was engaged in protected conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from engaging in that conduct; and (3) the adverse action was

motivated, at least in part, by the protected conduct. *Id.* Moreover, a plaintiff must be able to prove that the exercise of the protected right was a substantial or motivating factor in the defendant's alleged retaliatory conduct. *See Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001) (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).

Plaintiff alleges that he first noticed a change in the behavior of prison staff on March 11, 2023, when Defendant Caperalli scowled at him during an insulin appointment. Shortly thereafter, on March 20, 2023, Defendant Homer told Plaintiff, "[You're] in the middle of everything and [you're] a Foe Corn Hustler, pretending to be a Latin Count." (ECF No. 1, PageID.7.) Plaintiff states that in late summer of 2022, Corrections Officers at AMF had been assaulted and the administration had blamed Marcus Hill, the leader of the Foe Corna Hustla's. (*Id.*) Plaintiff contends that after this he was subjected to a campaign of harassment by both Defendants and numerous individuals who are not named as Defendants in this case. Plaintiff first alleges that he filed a grievance on May 1, 2023, stating that the ongoing "harassment" was making him paranoid. (*Id.* at PageID.9.)

### a.    Defendant Miller

Plaintiff alleges that Defendant Miller told him he was on his hit list on April 27, 2023. However, Plaintiff fails to allege that he engaged in any protected conduct prior to that incident, or that Defendant Miller was aware of any protected conduct by Plaintiff and was motivated by a desire to retaliate against him for engaging in that conduct. *Thaddeus-X*, 175 F.3d at 394. Therefore, Plaintiff's retaliation claim against Defendant Miller is properly dismissed.

### b.    Defendant Pangrassi

As set forth above, Plaintiff alleges that on May 20, 2023, Defendant Pangrassi saw Plaintiff looking out his window and made a talking gesture with his hands. Defendant Pangrassi then looked at the third row of windows, turned back to Plaintiff, and covered his mouth with his

hands. Plaintiff filed a grievance on Defendant Pangrassi regarding this event on May 23, 2023. There is no indication that Plaintiff filed a grievance on Defendant Pangrassi prior to this event or that Defendant Pangrassi was aware of any grievance filed by Plaintiff as of May 20, 2023. *Id.*

Moreover, these factual allegations do not support a finding that Defendant Pangrassi took an adverse action against him that would deter a person of ordinary firmness from engaging in protected conduct. To establish the second element of a retaliation claim, a prisoner-plaintiff must show adverse action by a prison official sufficient to deter a person of ordinary firmness from exercising his constitutional rights. *Thaddeus-X*, 175 F.3d at 396. The adverseness inquiry is an objective one and does not depend on how a particular plaintiff reacted. The relevant question is whether the defendants' conduct is "*capable* of deterring a person of ordinary firmness"; the plaintiff need not show actual deterrence. *Bell v. Johnson*, 308 F.3d 594, 606 (6th Cir. 2002) (emphasis in original).

A specific threat of harm may satisfy the adverse-action requirement if it would deter a person of ordinary firmness from exercising his or her First Amendment rights, *see, e.g., Thaddeus-X*, 175 F.3d at 396, 398 (threat of physical harm); *Smith v. Yarrow*, 78 F. App'x 529, 542 (6th Cir. 2003) (threat to change drug test results). However, certain threats or deprivations are so *de minimis* that they do not rise to the level of being constitutional violations. *Thaddeus-X*, 175 F.3d at 398; *Smith*, 78 F. App'x at 542.

In this case, Defendant Pangrassi's hand gestures illustrating talking and covering his mouth were vague and unaccompanied by any actual conduct, such as the writing of a misconduct ticket or a Notice of Intent. The Court concludes that such behavior would not deter a person of ordinary firmness from exercising his or her First Amendment rights. *See, e.g., Hardy v. Adams*, No. 16-2055, 2018 WL 3559190, at *3 (6th Cir. Apr. 13, 2018) ("The alleged threat by Adams

that she would make Hardy's life 'hell' is simply too vague to pass this threshold."); *Shisler v. Golladay*, No. 2:19-cv-80, 2019 WL 2590693, at *4 (W.D. Mich. June 25, 2019) (Golladay's threat that the ticket would be the least of the plaintiff's worries was "simply too vague" to support a First Amendment retaliation claim); *Dahlstrom v. Butler*, No. 2:18-cv-101, 2019 WL 91999, at *11 (W.D. Mich. Jan. 3, 2019) ("Krause's threat[--to 'get' a prisoner who files a grievance on Krause and 'steps out of line'--] is too vague and non-specific to deter a person of ordinary firmness from engaging in protected conduct."); *Yates v. Rogers*, No. 2:18-cv-180, 2018 WL 6629366, at *7 (W.D. Mich. Dec. 19, 2018) ("Defendant's vague threat to 'get' Plaintiff does not carry the same seriousness . . . ."); *Johnson v. Govern*, No. 2:17-cv-125, 2018 WL 6321548, at *2 (W.D. Mich. Dec. 4, 2018) ("Govern's alleged threat to 'put a case' on Johnson . . . was too vague to constitute adverse action."); *Hunter v. Palmer*, No. 1:17-cv-109, 2017 WL 1276762, at *11 (W.D. Mich. Apr. 6, 2017) ("Defendant DeMaeyer told Plaintiff that complaining would get him into a lot of trouble . . . . Such a vague threat of unspecified harm falls short of adverse action."). Accordingly, Plaintiff's retaliation claim against Defendant Pangrassi is properly dismissed.

### c.    Defendant Caperalli

Plaintiff alleges that Defendant Caperalli scowled at him during his insulin appointment on March 11, 2023, and when Plaintiff went to the insulin line on April 21, 2023, Defendant Caperalli was seated about five feet away drinking coffee. Plaintiff also states that on April 25, 2023, Defendant Caperalli entered the unit, saying that he came to get a duffle bag, which Plaintiff later learned was code for telling a prisoner to attack. Finally, Plaintiff alleges that on June 12, 2023, Defendant Caperalli was working in the yard with Defendants Pangrassi and Homer when Plaintiff had yard time.

As with Defendants Miller and Pangrassi, Plaintiff fails to allege facts showing that Defendant Caperalli took an adverse action against him in retaliation for Plaintiff engaging in

protected conduct. The bulk of Plaintiff's allegations against Defendant Caperalli occurred prior to Plaintiff filing his first grievance on May 1, 2023. Moreover, Defendant Caperalli's facial expressions and mere presence in the yard and on the unit would not deter a person of ordinary firmness from exercising his or her First Amendment rights. *Thaddeus-X*, 175 F.3d at 396, 398. Defendant Caperalli's statement that he came to get a duffel bag, even in light of Plaintiff's claim that it was code for telling a prisoner to attack, is far too vague to constitute adverse action for purposes of a retaliation claim. *Id.* at 398; *Smith*, 78 F. App'x at 542.

### d.    Defendant Smith

Plaintiff alleges that Defendants Smith asked Plaintiff why he had not come out for insulin on April 11, 2023, and stated that his girl was there. On May 31, 2023, Defendant Smith allegedly rose from his seat and took up a fighting stance when Plaintiff came out of his cell to shower. However, Defendant Smith apparently did not approach Plaintiff or threaten him. On the mornings of June 2, 3, and 4 of 2023, Defendant Smith opened Plaintiff's door for insulin callout even though Plaintiff had told him that he was no longer getting morning insulin, which exposed him to other corrections officers, including Defendants Sanchez and Caperalli. (ECF No. 1, PageID.12.)

Initially, the Court notes that although Plaintiff claims that Defendant Smith was retaliating against him for filing grievances and contacting the Director's Office, he fails to allege facts indicating that Defendant Smith was aware of any grievances filed by Plaintiff at the time he was opening Plaintiff's cell door for no reason. (*Id.*) Nor was the conduct allegedly engaged in by Defendant Smith sufficiently adverse to deter a prisoner of ordinary firmness from engaging in protected conduct. In *Thaddeus-X*, the Sixth Circuit recognized that some threats and deprivations are too minimal to constitute adverse action. Citing *Bart v. Telford*, 677 F.2d 622 (7th Cir. 1982), the *Thaddeus-X* court held that minor harassment is insufficient to constitute adverse action, because recognition of such a standard would "'trivialize the First Amendment.'" *Thaddeus* 175

F.3d at 397 (citing *Bart*, 677 F.2d at 625). Therefore, Plaintiff does not state a retaliation claim against Defendant Smith.

### e.    Defendant Homer

Plaintiff states that Defendants Homer engaged in a pattern of harassment toward him as follows. Plaintiff initially alleges that Defendant Homer told him that he was a Foe Corn Hustler on March 20, 2023, and that on April 27, 2023, he "flared up" in a hostile manner whenever Plaintiff passed him on the yard. (*Id.* at PageID.9.) Plaintiff states that on May 9, 2023, Defendant Homer was present in the insulin room with a "defiant" expression on his face. (*Id.* at PageID.10.) On May 20, 2023, Plaintiff noticed that Defendant Homer abruptly stopped talking to Defendant Lewis when he saw Plaintiff and that later that day, after an "associate" of Plaintiff's was taken to segregation, Defendant Homer shouted, "who's next?" (*Id.* at PageID.11.) On May 31, 2023, Defendant Homer stared at Plaintiff as he as injecting his insulin. On June 12, 2023, Defendant Homer stood by the stairs as Plaintiff passed and was later seated by the bubble, prompting Plaintiff to refuse his insulin because he believed that Defendant Homer was trying to provoke him. Plaintiff filed a grievance on Defendant Homer on June 13, 2023, and later that day his cell was "tossed, destroyed in an act of retaliation." (*Id.* at PageID.12.) Later that day, Defendant Homer whispered, "Aye sugar baby, this is harassment, I don't care if you never take your sugar, save the state some money." (*Id.*) Defendant Homer was again seated by the bubble when Plaintiff came out for his insulin that evening. (*Id.* at PageID.12–13.)

On June 14, 2023, Defendant Homer was in the insulin room and on June 15, 2023, "they" attempted to plant another virus on Plaintiff's tablet, but he disconnected the tablet before the virus could activate. (*Id.* at PageID.13.) On June 16, 2023, Defendant Homer told Plaintiff that they would get back at him for everything eventually. Plaintiff then saw one of the female corrections officers who had been assaulted by members of "almighty people nation" standing on the back

26

porch. Plaintiff indicates that he is part of the "almighty people nation." (*Id.*) Defendant Homer

was in the insulin room again that evening and mouthed "she's next" to Plaintiff while the nurse

was preparing his insulin. (*Id.*) Defendant Homer then asked Plaintiff what was up with his

neighbor who had so much to say but had now gone quiet. Plaintiff states that this occurred the

same day he turned in his step II grievance appeal regarding the events of May 20, 2023, which

implicated Defendant Homer. (*Id.*) On June 20, 2023, Plaintiff submitted a grievance on Defendant

Homer for telling him that they would get back at him eventually. Later that day, Defendant Homer

nodded toward Nurse Skinnerup and winked at Plaintiff, mouthing "she's next." (*Id.*)

As with other Defendants, Plaintiff's allegations indicate that the initial motivation for

Defendant Homer's supposed hostility was unrelated to any grievances or other protected conduct

on the part of Plaintiff. Indeed, the principal motivation expressed by Defendants generally and

acknowledged by Plaintiff appears to Defendants's belief that Plaintiff was involved in prison gang

activity. Involvement in prison gang activity is not protected conduct. *See, e.g., Johnson v. Stewart*,

No. 1:07-cv-77, 2008 WL 828086 (W.D. Mich. Mar. 26, 2008); *El-Shabazz v. Dunn*, No. 2:05-cv-

17, 2006 WL 3500621 (W.D. Mich. Dec. 4, 2006); *Beden v. Blair*, No. 2:05-cv-156, 2006 WL

2620649 (W.D. Mich. Sept. 12, 2006); *Huff v. Rutter*, No. 2:05-cv-92, 2006 WL 2039983 (W.D.

Mich. Jul. 19, 2006).

Nonetheless, after Plaintiff filed a grievance on Defendant Homer on June 13, 2023, his

cell was "tossed," and Defendant Homer later told Plaintiff that "this [was] harassment." (*Id.* at

PageID.12.) At least there is a temporal component to support Plaintiff's suggestion that his act

may have been retaliatory. However, Plaintiff fails to allege facts showing that Defendant Homer

performed the cell search or was responsible for ordering it. In addition, even if Defendant Homer

was responsible for the search and it was motivated by Plaintiff's grievance, Plaintiff alleges no

facts to support the inference that the search was sufficiently adverse to deter a prisoner of ordinary firmness from engaging in protected conduct. A cell search may be considered sufficiently adverse to satisfy the adverse-action requirement of *Thaddeus-X*, where the search leaves the cell in disarray and results in the confiscation or destruction of materials. *See Bell v. Johnson*, 308 F.3d 594, 605–6 (6th Cir. 2002) (citing *Walker v. Bain*, 257 F.3d 660, 664 (6th Cir. 2001)). Plaintiff fails to allege that any of his property or papers were confiscated or destroyed.

Plaintiff also alleges that on June 14, 2023, Defendant Homer was in the insulin room and that "they" attempted to plant another virus on Plaintiff's tablet the next day. (*Id.* at PageID.13.) However, there is no indication who "they" are, or if Defendant Homer was involved in the attempt to plant a virus on Plaintiff's tablet. On June 16, 2023, Defendant Homer told Plaintiff that they would get back at him for everything eventually. Defendant Homer was in the insulin room again that evening and mouthed "she's next" to Plaintiff while the nurse was preparing his insulin. (*Id.*) Defendant Homer then asked Plaintiff what was up with his neighbor who had so much to say but had now gone quiet. Plaintiff states that this occurred the same day he turned in his step II grievance appeal regarding the events of May 20, 2023, which implicated Defendant Homer. (*Id.*) On June 20, 2023, Plaintiff submitted a grievance on Defendant Homer for telling him that they would get back at him eventually. Later that day, Defendant Homer nodded toward Nurse Skinnerup and winked at Plaintiff, mouthing "she's next." (*Id.*) None of these allegations suggest anything more than harassment on the part of Defendant Homer. As noted above, minor harassment is insufficient to constitute adverse action, because recognition of such a standard would "'trivialize the First Amendment.'" *Thaddeus* 175 F.3d at 397 (citing *Bart*, 677 F.2d at 625). Moreover, even this minor harassment—by Plaintiff's own acknowledgment—appears to be motivated by Plaintiff's Security Threat Group participation, not by grievances complaining about

harassment. Therefore, Plaintiff's retaliation claims against Defendant Homer are properly dismissed.

### Conclusion

Having conducted the review required by the Prison Litigation Reform Act, the Court determines that Plaintiff's complaint will be dismissed for failure to state a claim, under 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c). The Court must next decide whether an appeal of this action would be in good faith within the meaning of 28 U.S.C. § 1915(a)(3). *See McGore v. Wrigglesworth*, 114 F.3d 601, 611 (6th Cir. 1997). Although the Court concludes that Plaintiff's claims are properly dismissed, the Court does not conclude that any issue Plaintiff might raise on appeal would be frivolous. *Coppedge v. United States*, 369 U.S. 438, 445 (1962). Accordingly, the Court does not certify that an appeal would not be taken in good faith. Should Plaintiff appeal this decision, the Court will assess the $505.00 appellate filing fee pursuant to § 1915(b)(1), *see McGore*, 114 F.3d at 610-11, unless Plaintiff is barred from proceeding *in forma pauperis*, *e.g.*, by the "three-strikes" rule of § 1915(g). If he is barred, he will be required to pay the $505.00 appellate filing fee in one lump sum.

This is a dismissal as described by 28 U.S.C. § 1915(g).

A judgment consistent with this opinion will be entered.


Dated:     October 31, 2023                              /s/ *Maarten Vermaat*
                                                          Maarten Vermaat
                                                          United States Magistrate Judge